UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| MARK ANTHONY JENKINS, | * |
| | * |
|    Plaintiff, | * |
| | * |
| VERSUS | *   CIVIL DOCKET NO. |
| | * |
| ROBERT M. MURPHY, | *   SECT: |
| Former judge of the | * |
| Louisiana Fifth Circuit Court of Appeal; | *   JUDGE: |
| | * |
| TIMOTHY O'ROURKE, Jefferson Parish | * |
| Assistant District Attorney, Jefferson Parish | * |
| Juvenile Court | *   MAG: |
| | * |
|    Defendants | * |
| | * |

*******************************************

Cecelia Farace Abadie
20 White Drive
Hammond, LA 70401
985-542-7859 phone & fax
cfabadie@gmail.com

*Attorney for the Plaintiff*
Mark Anthony Jenkins

## COMPLAINT

1.  Two rulings in the Louisiana Fifth Circuit's Disposition of July 31, 2015 were made in the complete absence of all jurisdiction. Judge Robert M. Murphy, ADA Timothy O'Rourke, and attorney Kristyl Treadaway conspired and acted to allow Judge Murphy to usurp the issue of legal paternity from Juvenile Court, where Jenkins' evidence was on the record. The conspirators stopped Juvenile Court from deciding legal paternity, so that it could take the place of biological paternity, which was the issue decided in the district court. A lie in the Assignment

1

of Errors and a writ application full of misrepresentations was used by Judge Murphy to decide the issue. The purpose of the conspiracy was to protect the Louisiana Department of Children and Family Services from possible liability for negligence and fraud. Judge Murphy, ADA O'Rourke, and attorney Treadaway conspired and carried out the plan with evil intent and callous indifference to Jenkins' federally protected right to have notice and the opportunity to be heard in the court deciding legal paternity.

2. Judge Murphy was a powerful presence on the Court of Appeal and the Supreme Court. He served as Judicial Counsel of the Supreme Court as both attorney and judge, and chaired the Judiciary Commission of the State of Louisiana. In 2015, two other judges on the panel joined him in signing a Disposition made in the complete absence of all jurisdiction; and all of the justices on the Louisiana Supreme Court, except for one, voted to deny a *writ of certiorari*. **There was no review of Judge Murphy's *de novo* ruling.** In 2017, when faced with a Petition to Nullify the rulings for the lack of jurisdiction and denial of the right to be heard, two judges joined him in signing a Disposition denying the lack of jurisdiction, and again, all of the justices on the Louisiana Supreme Court, except for one, voted to deny a *writ of certiorari*. The issue of lack of jurisdiction is clear cut and not a discretionary matter, and the corruption of the system is obvious. Plaintiff's Fourteenth Amendment could not be protected in the state system if Judge Murphy did not want it to be.

3. The "Disposition" of 2017 completely **avoided reviewing the issues of lack of jurisdiction and denial of the right to be heard.** In effect, there was no review by the Fifth Circuit of the ruling of the District Court, and no granting of the writ of *certiorari*. "Rooker – Feldman does not bar claims alleging that the defendants "so succeeded in corrupting the state judicial process as to obtain a favorable judgment." *Loubser v. Thacker*, 440 F.3d 439, 441-42,

2

(7th Cor. 2006) (citing Nessus v. Shepard, 68 F. 3d. 1003 (7th Cir. 1995) This is an action for monetary damages and for relief in the form of a judgment that the ruling that Jenkins is the legal father is null and void for lack of subject matter jurisdiction.

In support of this claim, Mark Anthony Jenkins shows as follows:

### I.  JURISDICTION

4. It is brought pursuant to 42 U.S.C. sec. 1983, 1985, 1986, and 1988 and under the Fifth and Fourteenth Amendments to the United States Constitution.

### VENUE

5. Venue lies in this Court under 28 U.S.C. sec 1391 because (1) the Defendants who caused the constitutional violations, the former judge of the Louisiana Fifth Circuit Court of Appeal, and Timothy O'Rourke reside or have offices in the Eastern District of Louisiana; and 2) the injury to plaintiff Mark Anthony Jenkins occurred in the Eastern District of Louisiana.

### II. PARTIES

### (Plaintiff)

6. Plaintiff Mark Anthony Jenkins is an adult citizen of the State of Louisiana and is currently domiciled in Donaldsonville, Louisiana.

### (Defendants)

Named defendants herein are:

7. **ROBERT M. MURPHY,** a person of the full age of majority, maintaining an office at 3500 North Hullen Street, Metairie, Louisiana. At all times described herein, **ROBERT M. MURPHY** was a judge on the Louisiana Fifth Circuit Court of Appeal and acting under color of law. He is sued in his individual capacity. His rulings, made in the absence of all jurisdiction, have been a continuing **obstruction to Jenkins' right to be heard.**

3

**8. TIMOTHY O'ROURKE** is an Assistant District Attorney for the Jefferson Parish District Attorney's Office and a supervising attorney and agent for the Louisiana Department of Children and Family Services (DCFS) at Jefferson Parish Juvenile Court/ Juvenile Justice Center, 1546 Gretna Blvd., Harvey, Louisiana, and acting in the name of the state and under the color of law at the time the events described herein occurred.  He is being sued in his individual capacity.

### III. FACTUAL ALLEGATIONS

9.  Mark Anthony Jenkins and Latasha Jackson were not married in 1997 when she gave birth to a son they named Mark Anthony Jenkins Jr. and signed the birth certificate. They separated and divorced in 2003. On October 27, 2003, Jenkins and Jackson contracted for Jenkins to pay support by agreeing to and signing the Hearing Officer Recommendation.  That agreement was the only basis for the Juvenile Court Order. There was no judgment of paternity.

10. Since Jenkins and Jackson were not married when Mark Jr. was born in 1997, the Department of Children and Family Services (DCFS) was required under La. R.S. 46:236.7 to establish either biological or legal paternity as the legal basis for a child support order.

### THE CONSPIRATORS WANTED TO PROTECT DCFS

11.  La. R.S. 46:236 et seq. required DCFS to offer a paternity test before requesting that a man sign an authentic act of acknowledgment to establish legal paternity or to establish biological paternity.

12. Since 1995, DCFS has maintained a databank of all authentic acts of acknowledgment. (La. R.S. 40:46.1D) Therefore, DCFS knew before it obtained an Order for Support in 2003 that Jenkins had not signed an authentic act of acknowledgment and was not the legal father.

13. Apparently, DCFS did not want to offer Jenkins a paternity test. It violated its own rules and federal law by choosing to forego obtaining a judgment of paternity as the basis for the Order for Support.   It settled for a contract for support between Jackson and Jenkins.

14.   When confronted with this violation of the law, DCFS has argued that La. R.S. 46:236.1.2 D(2) permitted it to obtain support from Jenkins based solely on his having signed the birth certificate**. However, that statute was not enacted until June 23, 2004, and the Order was issued in 2003.**

## THE AUTHENTIC ACT OF ACKNOWLEDGMENT ISSUE

15. In May, 2011, Jenkins' cousin, Rontrell Square, told him that an acquaintance, later identified as Sam Scott, claimed to be the father of Mark Anthony Jenkins, Jr.; and provided proof of his claim. Jenkins requested a copy of all acknowledgments he had signed, and received from Vital Records the birth certificate and a statement that an original of "an acknowledgment" had been lost during Hurricane Katrina.

16. Latasha Jackson refused, through her private attorney, to submit herself and Mark Jr. to a paternity test.  On February 15, 2012, Plaintiff Mark Anthony Jenkins filed in the 24th Judicial District Court a Petition for Revocation of an Acknowledgment, Damages for Fraud, and a motion for a court-ordered paternity test.

17. DCFS was made an indispensable party to the lawsuit, as required by welfare law. Jackson filed an Exception of Prescription to the right to revoke an authentic act of acknowledgment, based on the prescriptive period added to La. R.S 9:406 in 2008. However, there was no evidence that Jenkins had signed an authentic act of acknowledgment.  On January 22, 2013, District Court ruled that the prescriptive period did not apply back to 1997, and denied the exception.

18. The Fifth Circuit reversed the District Court on May 14, 2013, holding that the prescriptive period was retroactive. **Neither the district court nor the Fifth Circuit ruled on whether Jenkins signed an authentic act of acknowledgment that would make him the legal father.**

19. After court-ordered DNA Test Results came in, Jenkins learned he was not the biological father. Another DNA Test Report has proved that Sam Scott, who claimed to be Mark Jr.'s father, **is** his father. Rontrell Square, the witness in the hearing to obtain a court order for a DNA Test, testified that Scott told him that Latasha Jackson presented him with Mark Jr. as his son when Mark Jr. was a baby. That took place years before Jackson and Jenkins contracted for child support. Scott's statement to Rontrell Square can come into evidence under an exception to the hearsay rule, even if Scott does not appear following a subpoena, because it is a statement of blood relationship by the biological father of the child.

20. On August 26, 2013 Jenkins filed a Petition to Nullify the support order in Juvenile Court. The petition was not served, and Jenkins asked for a hearing on why it was not served. Juvenile Court required a determination of legal paternity before allowing the petition to be served.

21. ADA John Fitzmorris refused to answer an interrogatory or produce evidence of an authentic act signed by Jenkins. After research, Jenkins learned that DCFS had a databank of all authentic acts of acknowledgments. He informed the court on July 7, 2014, and it ordered DCFS to produce all acknowledgments executed by Jenkins for a hearing on September 14, 2014.

22. On September 14, 2014, ADA John Fitzmorris reported that DCFS did not have an authentic act of acknowledgment; **but when the Minutes arrived they only reported that there was a signed birth certificate, even though the purpose of the hearing was to**

6

**determine if there was an authentic act of acknowledgment. Everyone already knew there was a signed birth certificate.**

23. Jenkins moved for a clear statement in the Minutes that there was no authentic act. The Court set a hearing for April 27, 2015.

24. On October 15, 2014, Jenkins filed a Rule to Show Cause in District Court in order to obtain a judgment that Jenkins was not the biological father based on the DNA Test Report. He also asked for his name to be removed from the birth certificate.

### A WRIT APPLICATION FROM DISTRICT COURT WAS USED TO MOVE THE ISSUE OF LEGAL PATERNITY FROM JUVENILE COURT TO THE FIFTH CIRCUIT

25. Jackson's attorney, Kristyl Treadaway, filed an exception to the right to rebut the presumption of biological paternity created by signing the birth certificate. On January 22, 2015, district court ruled that the DNA Test Report be admitted into evidence and that Jenkins was not the father of Jackson's child. Judgment was signed on February 4, 2015.

26. On April 27, 2015, Krystal Treadaway stipulated for the parties in Juvenile Court that there was no authentic act of acknowledgment. That stipulation was reported in the Minutes. At that point, it appeared that **Jenkins would be found "not the legal father."**

27. Juvenile Court set a hearing date for June 15, 2015 to rule on legal paternity. It ordered Treadaway or DCFS to produce a memorandum on why Jenkins should be found the legal father despite the fact that there was no authentic act of acknowledgment.

**28. On May 28, 2015, plaintiff amended the petitions in both district court and juvenile court to allege negligence and fraud by DCFS in obtaining the support order in**

**2003, and asked for reimbursement of child support payments.  This was the cause for the conspiracy.**

29.   Reimbursement of child support payments was not prohibited under R.S.46:236 *et seq*., nor any other statute, when a payor, who is not the legal or biological parent, and who paid support solely under a contract, sued for reimbursement based on error in the cause of the contract.

30.   However, **Treadaway's Juvenile Court stipulation that there was no authentic act of acknowledgment was not in the District Court record, and the defendants wanted to have the issue of legal paternity heard on the District Court record.**

### THE CONSPIRACY

31.  Judge Murphy, O'Rourke, and Treadaway arranged to obtain a continuance of the June 15, 2015 hearing on legal paternity to stop Juvenile Court from deciding the issue. Neither Treadaway nor DCFS prepared a memorandum explaining why Jenkins should be held the legal father.  They were sure a continuance would be granted.

**32.  On June 15, 2015,** Treadaway and ADA LeKita Robertson, with supervisor ADA O'Rourke present, argued that Juvenile Court should refrain from ruling on legal paternity since Treadaway's Application for Writs from the District Court Judgment **was "pending."**

33. **When undersigned counsel stated that she had not received a copy of the Application for Writs, Treadaway shrugged her shoulders as if to say she did not know why it had not been received.**  Undersigned counsel argued that the issues decided in the February 4, 2015 Judgment of the District Court were not related to legal paternity, and the continuance should not be granted. The continuance was granted over the objection.

8

34. Actually, on June 15, 2015, Treadaway had not yet filed her Writ Application. She **filed the Writ Application on June 23, 2015.** The Assignments of Errors stated: "District Court erred when it overruled the Exception of Prescription filed by Latasha Jackson and found Mark Anthony Jenkins Sr. to not be the **legal** father of the minor child." (Emphasis added.)

35. Given how easy it is to determine that the District Court only decided biological paternity in the February 4, 2015 Judgment, Treadaway would not have had the audacity to lie about the scope of review in her writ application unless she had been told to do so. Her lie was needed to give a semblance of supervisory jurisdiction.

36. The purpose of the plan was to blindside Jenkins, even if it required violation of due process of law, in order to deny him the opportunity to have Treadaway's stipulation before the court that would rule on legal paternity.

37. O'Rourke, Judge Murphy, and Treadaway also jointly colluded in deciding which misrepresentations of facts and law to put in the Writ Application in order to help Judge Murphy construct the "legal argument" he had in mind for the Disposition. This is shown by the fact that Treadaway had the audacity to put misrepresentations of law into her writ application, and those misrepresentations were the same as misrepresentations in the Disposition. She was obviously unconcerned about lying to the Fifth Circuit.

38. Plaintiff's Opposition brief pointed to the record that showed District Court had not ruled on legal paternity and attached certified copies of the Minute-Entry Judgments of Juvenile Court for April 27, 2015, and September 15, 2014, to give **notice t**o the Court of Appeal that the parties had stipulated in Juvenile Court that there was no authentic act of acknowledgment. The Fifth Circuit was obligated not to rule in the absence of that evidence.

**THE DISPOSITION OF JULY 31, 2015**

39. On July 31, 2015, the Disposition was published, and the Fifth Circuit had re-decided the authentic act question by *de novo* review, and ruled that Jenkins "judicially confessed" to signing an "an acknowledgment of legal paternity." It ruled he was the legal father based on that "evidence."

40. A judgment made in the absence of all jurisdiction never becomes valid. Judge Murphy had a duty to rule within the limits of supervisory jurisdiction to afford Jenkins the right to be heard. Since his ruling continues to bar Jenkins from his right to be heard under the Fifth and Fourteenth Amendments to the United States Constitution in the litigation in district court to prove Jackson's fraud, and obtain remuneration, Judge Murphy has a **continuing obligation** to compensate for the damages.

41. Judge Murphy violated the limits on an appellate court's jurisdiction under the Louisiana Constitution, Article V, sec, 5(F). The Louisiana Supreme Court ruled that supervisory jurisdiction is limited to those issues "which have been ruled on by the trial court," *Church Point Wholesale Beverage v. Tarver,* 614 So.2d 697, 700-701 (La. 1993); *City of Baton Rouge v. Shelton Ross*, 654 So.2d 1311 (S.C. 1995) LEXIS 1142;

42. In his disposition on July 31, 2015, Judge Murphy pretended he conducted a *de novo* review and found a "judicial confession" to signing an acknowledgment of legal paternity. His *de novo* review was not within the court's jurisdiction. *De novo* review is conducted when the trial court makes an error in deciding a fact. In this situation, the District Court had not ruled on whether there was an authentic act of acknowledgment for there to be an error of fact.

43. *De novo* review is appropriate only "when an appellate court has all the facts before it." *In Re: C.B., Applying for Adoption,* 94-C-0755 (La. Oct 17, 1994), 643 So.2d 1251,1256. Judge Murphy knew the determinative fact that there was no authentic act of

acknowledgment was not in the record before him; and he planned and conspired to be able to rule on the issue **without** having the fact before the court.

44. Judge Murphy deliberately misapplied the law on judicial confessions by characterizing non-specific statements that Jenkins signed the birth certificate and "an acknowledgment" to be a "judicial confession" to signing an **authentic** acknowledgment.

45. Justice Hughes' Dissent from the denial of a writ of certiorari, summed it up.

> Respectfully, the seemingly untimely review and intervention of the Court of Appeal to decide an issue not addressed in the trial court's judgment, based on the concept of a "judicial confession," is clearly wrong …This is not justice but judicial "gotcha.'….

46. On September 15, 2015, undersigned counsel faxed a letter to Treadaway and O'Rourke, in which she accused them of colluding with Judge Robert Murphy. They were the only recipients of the letter. The next day, attorney Treadaway mailed a complaint to the Louisiana Disciplinary Counsel about undersigned counsel's "unprofessionalism." A hearing on that Complaint is set for April 20, 2018 before the Disciplinary Board.

47. On October 7, 2015, Plaintiff filed a Motion in District Court to rebut the judicial confession ruling with the stipulation in the Juvenile Court Minutes. It was denied, but the Judgment was not signed until February 1, 2016.

## THE PETITION TO NULLIFY AND ANOTHER DISPOSITION

48. On March 10, 2016, plaintiff filed a Petition to Nullify the rulings in the Disposition of July 31, 2015 for lack of jurisdiction and denial of the right to be heard. Exceptions of No Cause of Action and *Res Judicata* were granted by the District Court Judgment, which had to be

amended to contain decretal language on November 7, 2016.  Plaintiff had already filed an appeal on September 16, 2016.

49. The appeal went to a panel that included Judge Murphy. The Disposition of February 22, 2017, affirmed the dismissal.  Judge Marc E. Johnson wrote the Disposition with Judges Robert M. Murphy and Stephen J. Windhorst joining him in signing it. Jenkins requested a Reconsideration on March 9, 2017 and it was denied on March 22, 2017.

50. On April 21, 2017 Jenkins filed an application for *writ of certiorari*.  It was denied on September 2, 2017, with Justice Hughes dissenting.

51.  By his participation in the panel on the nullification issue, Judge Murphy was presented with the opportunity to stop the damage his previous Disposition had done.  He chose to violate his duty again.

52.  Judge Murphy saw to it that the issues presented in plaintiff's writ application were **not reviewed**. The Disposition of February 22, 2017, dodged the issue of lack of jurisdiction by **c**laiming that the Fifth Circuit had jurisdiction over legal paternity on July 31, 2015 because it reviews rulings of lower courts which have jurisdiction over "civil matters including family and juvenile court matters in La. Const. art. V, sec. 10."  That is not subject matter jurisdiction for supervisory review.

53.  The Disposition claimed that the Fifth Circuit had supervisory jurisdiction to decide legal paternity in the July 31, 2015 Disposition due to the Application for Writs and Disposition in 2013, without offering any explanation.

54.  The Disposition ignored the denial of the right to be heard except for the quip that Jenkins could have asked for oral argument, as if that would have satisfied the right to be heard.

55. The Disposition of February 22, 2017 repeated the same misrepresentations and misapplications of law that Judge Murphy employed in his 2015 Disposition.

a. It continued to confuse a birth certificate acknowledgment with an acknowledgment by authentic act.

b. It refused to take notice that Treadaway's Assignment of Error, "…the trial court erred when it overruled her exception of prescription and found Jenkins not to be the **legal father**" (emphasis added) was absolutely false.

c. It refused to recognize that former C.C.Art. 203 set out the differences between an acknowledgment by authentic act and a birth certificate acknowledgment, and refused to apply it.

d. It misrepresented what the 2013 Disposition ruled.

e. It refused to recognize that on writ applications, litigants **are given notice and the opportunity to be heard b**y the court's adherence to the rules on supervisory jurisdiction and scope of review.

56. The Petition to Nullify, if fairly and legally reviewed, would have survived the exceptions. It met all the requirements for nullification of a judgment: 1) the judgment was obtained by deprivation of the right to be heard through keeping the stipulation from being considered; 2) the ground for nullity was not considered by the appellate court, as required by C.C.P. art. 2005, and  3) the rulings sought to be nullified were final judgments.

57. On February 22, 2017, Judge Murphy affirmed the granting of the Exceptions to the Petition to Nullify, and, in doing so, reaffirmed the denial of Jackson's right to be heard, and continued the imposition of legal paternity status on him.

58. Judge Marc E. Johnson wrote the Disposition with Robert M. Murphy and Stephen J. Windhorst joining him in signing it. Judge Murphy was a very influential and powerful member of the Fifth Circuit. His influence on the other two judges who were reviewing **his** Disposition meant they would not act as a check on the abuse of power. A Request for Reconsideration was denied on March 22, 2017.

59. An Application for a Writ of Certiorari was filed on March 9, 2017 and denied on March 22, 2017.

## COVER UP

60. On February 9, 2017, O'Rourke altered, or had altered, recordings of Juvenile Court hearings in order to remove a statement he inadvertently made during a hearing that showed he knew that Judge Murphy violated supervisory jurisdiction and denied the right to be heard in order to protect DCFS, whom he represented.

61. The recordings of juvenile court hearings were needed for undersigned counsel to defend herself by proving her allegations of collusion were reasonable. Undersigned counsel obtained a *subpoena duces tecum* to listen to and order transcripts of three Juvenile Court hearings. On February 8, 2018, undersigned counsel faxed a copy of a *subpoena duces tecum* to the Juvenile Court judge and brought the subpoena to the sheriff for service.

62. On February 9, 2018, the judge's law clerk, Andrea Marcotte, escorted undersigned counsel to an office to listen to the recordings that appeared to be generated from another office by a technician. The October 15, 2015 recording was supposed to be played first, but when the recording began it was related to another case. A clerk suggested that undersigned counsel listen to the other two recordings while the technician obtained the recording of the October 15, 2015

hearing. After about 30 minutes, respondent had listened to the two other recordings. The recording of the October 15, 2015 hearing was still not ready.

63. About five minutes later the October 15, 2015 recording was ready. Undersigned counsel listened to the entire recording and her **complaints about the" kangaroo court" and the "Star Chamber" were not on it; neither was ADA O'Rourke's unguarded, incriminating outburst.**

64. Undersigned counsel remarked to the clerks who were there that Mr. O'Rourke had gotten to it first. As soon as undersigned counsel left the office, she saw O'Rourke for the first time that day, a few feet away.

65. He was speaking with a young woman. Undersigned counsel asked to speak with him alone. She asked if he remembered asking her why she had sued the department. He admitted he may have said something like that; and undersigned counsel remembered that in the recording of June 15, 2015, he said in a calm voice, "Why did you wait three years to sue the department."

66. But **that was not the exchange that took place in the October 15, 2015 hearing**. On October 15, 2015, undersigned counsel was angry about the outrageous conduct of the court. She compared what had happened to the Star Chamber and a kangaroo court. ADA O'Rourke became angry too; he lost control and blurted out, "Why did you sue the department."

67. The recording undersigned counsel was allowed hear contained undersigned counsel's apology to the Hearing Officer Amato, although the Hearing officer had not admonished undersigned counsel. What is interesting is that undersigned counsel's apology was on the redacted recording, but the heated exchange between O'Rourke and undersigned counsel was missing.

15

    **68**. That recording is material evidence for this action too. As a direct and proximate result of tampering with evidence, ADA Timothy O'Rourke has caused plaintiff Mark Anthony Jenkins to be deprived again of the right to present that evidence in this action for violation of his civil and constitutional rights.

   69. After O'Rourke was caught by undersigned counsel outside the offices where the recordings were kept, Jenkins received a check for $1600.00 for the money DCFS had been deducting from his paychecks long after he was not required to pay child support.

**IV.    COUNTS**

**COUNT I**

**42 U.S.C. SEC 1983, 1985, 1986, and 1988 AGAINST TIMOTHY O'ROURKE**

    70. Paragraphs 1 through 69 are incorporated herein by reference as though fully set forth.

    71. Sometime between the filing of allegations of negligence and fraud against DCFS and June 15, 2015, the day set for Juvenile Court to rule on legal paternity, O'Rourke, Treadaway, and Judge Murphy conspired to protect DCFS, and, by effect, Treadaway's client too.

    72. ADA Timothy O'Rourke, a supervising attorney assigned to Juvenile Court, while acting under color of law, jointly conspired with Judge Robert Murphy and attorney Kristyl R. Treadaway; and carried out the plan with evil intent and callous indifference to a federally protected right, to switch the legal paternity issue from Juvenile Court to the Fifth Circuit in order to have legal paternity decided in the absence of Treadaway's stipulation in order to protect DCFS from financial liability.

16

...
...
...

73. As a direct and proximate result of his participation in the conspiracy and recent tampering with the recordings of Juvenile Court hearings, Timothy O'Rourke has "so succeeded in corrupting the state judicial process as to obtain a favorable judgment" by depriving Mark Anthony Jenkins of the right to be heard.   He is being sued in his individual capacity. Plaintiff Mark Anthony Jenkins claims damages for injury under 42 U.S.C. 1983, 1985, 1986, 1988, the Fifth and Fourteenth Amendments to the United States Constitution, against Timothy O'Rourke.

## COUNT II

**42 U.S.C. SEC 1983, 1985, 1986, 1988 AGAINST JUDGE ROBERT M. MURPHY**

74. Paragraphs 1 through 69 are incorporated herein by reference as though fully set forth.

75. Defendant Robert M. Murphy, as a Judge on the Louisiana Fifth Circuit Court of Appeal, acted individually under color of law and jointly with ADA O'Rourke and attorney Krystal Treadaway with evil intent and callous indifference to a federally protected right, to conspire and carry out a plan to intentionally deprive Mark Anthony Jenkins of his due process right under the Fifth and Fourteenth Amendments to the U.S. Constitution to have notice and the opportunity to be heard. They did this by arranging to stop Juvenile Court from deciding whether Mark Anthony Jenkins was the legal father of Latasha Jackson's son; to enable Judge Murphy to decide the issue of legal paternity himself, in the absence of all jurisdiction, and in the absence of Jenkins' evidence in the Juvenile court record that he had not signed an authentic act of acknowledgment that would make him the legal father.  This was done so that Judge Murphy could write the Disposition to rule that Jenkins was the legal father; and protect the Department of Children and Family Services from liability for negligence or fraud.  Plaintiff Mark Anthony Jenkins claims damages for injury under 42 U.S.C. 1983, 1985, 1986, 1988, the Fifth and Fourteenth Amendments to the United States Constitution, against Robert M. Murphy.

76. As a direct and proximate result of Judge Murphy's Disposition of July 31, 2015, and his conspiracy with ADA Timothy O'Rourke and attorney Kristyl Treadaway; and as a direct and proximate result of Judge Murphy's failure to allow a fair review of the issue lack of jurisdiction for his Disposition of July 31, 2015, he "so succeeded in corrupting the state judicial process as to obtain a favorable judgment" and **obstructed Jenkins' right to be heard.**

## V.    DAMAGES

77.  As a direct and proximate result of the actions described above, Mark Anthony Jenkins has incurred damages including:

1) attorney fees and court costs, including but not limited to the following:

Aug.14, 2015   Application for Reconsideration filed; denied **on September 4, 2015**

Aug. 28, 2015  Application for Writ of Certiorari filed; denied **on September 4, 2015**

Oct. 7, 2015     Motion to Rebut Finding of Judicial Confession; Judgment signed February 1, 2016

Mar. 10, 2016    Petition to Nullify filed; Judgment denying it signed November 7, 2016

Sept. 16, 2016    Appeal filed; Disposition issued February 22, 2017

March 9, 2017    Request for Reconsideration filed; denied on March 22, 2017

April 21, 2017   Application for Writ of Certiorari filed; denied on September 2, 2017.

2) violation of his right under the Fifth and Fourteenth Amendments to the United States Constitution to be given notice and the opportunity to be heard in the determination of legal paternity.

3)  deprivation of his right to a fair trial to obtain reimbursement of the support payments he had made under a fraudulent contract; and possibly of his right to obtain a judgment that Latasha Jackson committed fraud.

4) imposition of the status of "legal father," with whatever obligations may arise there from, when he is neither the legal nor biological father under the applicable law in 1997, and was the victim of Jackson's fraud, and the corruption of the legal process.

5) the re-imposition of his name on the birth certificate after it had been removed following the Judgment that 24th Judicial District Court that he was not the biological father.

6) He has not yet asked for a trial in District Court to prove Jackson's fraud because he wanted to first obtain reversal or nullifications of the Fifth Circuit's rulings, which are an impediment to reimbursement of child support payments. Plaintiff dismissed his suit against DCFS in an effort to at least get a fair ruling against Jackson.

## VI.  PRAYER FOR RELIEF

WHEREFORE, plaintiff requests that this Court:

A.  find the defendants liable to plaintiff jointly, severally, and *in solido*;  for

a.  compensatory damages, including attorney fees and court costs for work and filings from the preparation of the Request to Reconsider, filed in August, 2015 through the preparation and filing of the Application for a Writ of Certiorari, filed on April 20, 2017, with interest until paid;

b. punitive damages for the conspiring to and violating Jenkins' civil rights with evil intent and callous indifference to a federally protected right, with interest until paid;

c. reimbursement of all child support payments Jenkins made, with interest until paid;

d. attorney fees and costs for this action, with interest until paid;

e)  whatever other relief this court deems appropriate.

B. and, declare that the rulings of the Louisiana Fifth Circuit Court of Appeal that there was a judicial admission to signing an acknowledgment of legal paternity making Jenkins the legal father, is null and void.                              Respectfully submitted,

                                                      <u>"s"/ Cecelia Farace Abadie"</u>
                                                      Cecelia Farace Abadie, La. Bar No. 19874
                                                      Attorney for Plaintiff, Mark Anthony Jenkins
                                                      20 White Drive, Hammond. La. 70401
                                                      Phone & Fax: 985-542-7859
                                                      cfabadie@gmail.com